962 F.2d 853
 UNITED COMMERCIAL INSURANCE SERVICE, INCORPORATED, d/b/a
United Checkwriter Services; Burton D. Rayden;
Jeffrey L. Rayden; Joel Rayden, Plaintiffs,
v.
The PAYMASTER CORPORATION, Defendant.
The PAYMASTER CORPORATION, Counterclaim Appellant,
v.
Burton D. RAYDEN, et al., Counterclaim Defendants,
and
American Bankers Insurance Company of Florida, Counterclaim
Defendant-Appellee.
 No. 90-56108.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Oct. 10, 1991.
Decided April 14, 1992.
 
 Dennis M. Perluss, Hufstedler, Kaus & Ettinger, Los Angeles, Cal., for appellant.
 James F. Jorden, Jorden, Schulte & Burchette, Miami, Fla., for appellee.
 Appeal from the United States District Court for the Central District of California.
 Before FLETCHER, W. NELSON, and BRUNETTI, Circuit Judges.
 D.W. NELSON, Circuit Judge:
 
 
 1
 Appellant Paymaster Corp. was awarded a judgment in excess of $11 million in compensatory and punitive damages against several defendants, including appellee American Bankers Insurance Corp. (American). Paymaster settled with all defendants other than American for $1.7 million in compensatory damages. Concurrent with this settlement, Paymaster executed a partial satisfaction of judgment in favor of American. The agreement provided that American's punitive damage liability would be reduced by $1.7 million, in exchange for American dropping its claim against the other defendants for indemnification.[1]
 
 
 2
 American claims that this agreement was separate from the underlying settlement, and that it is therefore entitled to a $1.7 million reduction in compensatory damages (for which it was jointly and severally liable) pursuant to the settlement and a $1.7 million reduction in its punitive damages pursuant to the satisfaction. Paymaster claims that it agreed to reduce American's punitive damage liability by $1.7 million instead of reducing compensatory damages. The district court found that American was entitled to a $3.4 million setoff on the basis of two separate satisfactions. We affirm.
 
 FACTS
 
 3
 Paymaster sued American, United, and several individual defendants (the Raydens) for violations of the Lanham Act and California unfair competition law. In 1987, Paymaster was awarded a judgment against all defendants for roughly $6.0 million in compensatory damages and costs. All defendants were jointly and severally liable for these damages. In addition, United was held liable for $3.0 million in punitive damages and American for nearly $2.4 million in punitive damages. American and the other defendants maintained cross-claims against each other for indemnification.
 
 
 4
 All defendants appealed the district court's judgment on the merits to the Ninth Circuit. While that appeal was pending, Paymaster agreed with United and the Raydens to settle their portion of the case. Pursuant to the Settlement Agreement, the Raydens would pay $500,000 and United's insurers would pay $1.2 million to Paymaster. However, the Raydens and United conditioned their settlement with Paymaster on receiving a full release from American of its cross-claim for indemnity. Thus, Paymaster could not recover its $1.7 million from United unless it could somehow persuade American to give up its cross-claim against United for the full amount of the judgment.
 
 
 5
 American demanded consideration in exchange for relinquishing its cross-claim against United and the Raydens. Accordingly, Paymaster executed a Partial Satisfaction of Judgment in favor of American, which provided that American's punitive damage liability would be reduced in an amount equal to the amount United and the Raydens ended up paying Paymaster. This partial satisfaction was expressly "in consideration of [American] entering into its contingent settlement agreement and mutual release with [United] ..." Paymaster letter to American, Nov. 11, 1988.
 
 
 6
 In return, American executed a Settlement Agreement and Mutual Release with United in which each agreed to drop its claims against the other. This mutual release was expressly contingent upon American receiving the partial satisfaction of judgment. Id. at 1.1.
 
 
 7
 Paymaster and American subsequently disputed the amount remaining due on the judgment. American filed a Motion for Partial Relief from Judgment under Rule 60(b)(5), claiming that the combined effect of the agreements was to reduce its liability by $3.4 million ($1.7 million each in compensatory and punitive damages). The trial judge received declarations from counsel involved in negotiating the agreements, and heard oral argument. Relying on the two agreements, the partial satisfaction, and Paymaster's November 11 letter, as well as on two of the declarations of counsel, the trial court concluded that two separate satisfactions occurred--one between United and Paymaster, and another between American and Paymaster. It therefore concluded that American's liability should be reduced by $3.4 million, and entered judgment accordingly. Paymaster appeals.DISCUSSION
 
 Standard of Review
 
 8
 District court decisions under Rule 60(b) are normally reviewed only for an abuse of discretion. Browder v. Director, Illinois Dep't of Corrections, 434 U.S. 257, 263, 98 S.Ct. 556, 560, 54 L.Ed.2d 521 (1978). However, we review de novo the district court's decision of questions of law. Pekarsky v. Ariyoshi, 695 F.2d 352, 354 (9th Cir.1982), cert. denied 464 U.S. 1052, 104 S.Ct. 735, 79 L.Ed.2d 194 (1984).
 
 
 9
 "The construction and enforcement of settlement agreements are governed by principles of local law which apply to interpretation of contracts generally." Jeff D. v. Andrus, 899 F.2d 753, 759 (9th Cir.1989). This is true even though the underlying cause of action is federal. Id.; In re Beverly Hills Bancorp, 649 F.2d 1329, 1332-33 (9th Cir.1981). Under California law, the interpretation of a contract is a question of law subject to de novo review. If interpretation requires the resolution of disputed facts or a determination of the credibility of extrinsic evidence, the appellate court will defer to the district court's resolution of those issues if it is supported by substantial evidence. But once the facts are resolved, the interpretation of the agreement in light of those facts is a question of law. Parsons v. Bristol Dev. Co., 62 Cal.2d 861, 44 Cal.Rptr. 767, 770, 402 P.2d 839, 842 (1965).
 
 
 10
 In this case, the district court relied primarily on the language of three contracts--the Settlement Agreement between United and Paymaster, the Settlement Agreement and Mutual Release between United and American, and the November 11 letter from Paymaster to American. The court also considered the declarations of the parties' attorneys regarding the meaning of the letter, resolving the conflict in their testimony in favor of American. Finally, it considered issues of public policy in interpreting the contract. The resolution of the credibility dispute regarding the meaning of the letter must be upheld unless clearly erroneous, while the remainder of the district court's conclusions are subject to de novo review.
 
 Contract Interpretation
 
 11
 A settlement agreement is treated as any other contract for purposes of interpretation. Adams v. Johns-Manville Corp., 876 F.2d 702, 704 (9th Cir.1989). Under California law, the intent of the parties determines the meaning of the contract. Cal.Civil Code §§ 1636, 1638. The relevant intent is "objective"--that is, the intent manifested in the agreement and by surrounding conduct--rather than the subjective beliefs of the parties. Lawyer's Title Ins. Co. v. U.S. Fidelity & Guar. Co., 122 F.R.D. 567, 569 (N.D.Cal.1988); Beck v. American Health Group Int'l, 211 Cal.App.3d 1555, 260 Cal.Rptr. 237, 242 (1989). For this reason, the true intent of a party is irrelevant if it is unexpressed. Union Bank v. Winnebago Indus., 528 F.2d 95, 99 (9th Cir.1975); Mill Valley v. Transamerica Ins. Co., 98 Cal.App.3d 595, 159 Cal.Rptr. 635, 639 (1979).
 
 
 12
 Applying these principles to this case is not simple. The relevant documents are silent on whether the $1.7 million reduction in American's punitive damages was meant to replace or supplement the compensatory damage reduction.[2]
 
 
 13
 The general legal rule is that a settlement with one defendant reduces the liability of all other defendants by an equal amount. Krusi v. Bear, Stearns & Co., 144 Cal.App.3d 664, 192 Cal.Rptr. 793, 798 (1983). This rule prevents a plaintiff from obtaining several satisfactions of its judgment--one from each party. Paymaster contends that this rule supports its position, since the legal presumption is that liability is reduced by an amount equal to the settlement ($1.7 million). What Paymaster ignores is the fact that American's liability is reduced by $1.7 million as a matter of law, without any agreement being signed. It would be redundant to draft an agreement which produced exactly the same result as would occur absent the agreement.
 
 
 14
 Paymaster contends that the agreement did modify the normal rule, since it provided for the $1.7 million to be credited towards American's punitive rather than compensatory damage liability.[3] But since Paymaster claims it intended to modify the normal rule (by replacing American's credit for compensatory damages), one would expect that at least one of the four documents at issue would mention the modification explicitly. No indication of such an intent to substitute punitive for compensatory damages can be found. Under well-established principles of California law, we cannot rely in interpreting the contract on Paymaster's unexpressed intent to deviate from the normal legal rule. See Mill Valley, 159 Cal.Rptr. at 639. In short, because it is Paymaster rather than American whose interpretation deviates from the normal operation of law, it is Paymaster who must pay the price for failing to specify what the contract meant.[4]
 
 
 15
 That the parties in fact intended there to be two separate satisfactions is suggested by the change in the language of the letter Paymaster sent to American. Paymaster sent a letter agreement on November 10. The district court found that American returned the letter unsigned because it did not specify that the consideration supporting the agreement to reduce punitive damages was independent of Paymaster's settlement with United. This finding, although disputed by Paymaster, is a factual conclusion from the extrinsic evidence and is not clearly erroneous.[5] The revised letter, dated November 11, provided that the Partial Satisfaction of Judgment was executed in consideration for American agreeing to drop its cross-claims against United. It said nothing about American giving up its right to a $1.7 million reduction in compensatory damages. This provision, and the fact that American insisted on its inclusion, suggest that American intended the Partial Satisfaction to operate independently of United's settlement, and that Paymaster acquiesced in that interpretation.
 
 
 16
 Finally, Paymaster relies on two cases which it claims establish a strong presumption against recording setoffs in an amount greater than plaintiff actually received. See FSLIC v. Butler, 904 F.2d 505, 512 (9th Cir.1990) ("The agreement on the amount of setoff should be very specific before the plaintiff is considered to have agreed to a setoff larger than what he received in consideration from the settling defendant."); accord Arbuthnot v. Relocation Realty Serv. Corp., 227 Cal.App.3d 682, 278 Cal.Rptr. 135, 138 (1991). These cases are inapplicable. The district court did not calculate the setoff at twice the value of the settlement. Instead, it found that two separate satisfactions occurred. The first, between United and Paymaster, operated by law to reduce American's compensatory damage liability by $1.7 million. In the second, American agreed to drop its cross claims in exchange for a $1.7 million reduction in punitive damages.[6]
 
 
 17
 In short, this Court is not persuaded that the contracts evidence an intent that the $1.7 million reduction in punitive damages was intended to replace the $1.7 million reduction in compensatory damages. Instead, the documents support the conclusion that the $1.7 million satisfaction of punitive damages was separate from and independent of the satisfaction of compensatory damages.[7]
 
 Oral Testimony
 
 18
 Paymaster claims that it should have been allowed to present oral testimony--specifically, the testimony of attorneys who participated in drafting the agreements--in support of its interpretation. Under Fed.R.Civ.P. 43(e), which normally governs motions, the trial court has wide discretion in deciding whether to admit or deny oral testimony. Miles v. Dep't of the Army, 881 F.2d 777, 784 (9th Cir.1989). Paymaster contends, however, that this case should be treated as a trial on the merits of a contract action, and therefore should fall under Rule 43(a ), which requires a district court to take oral testimony. Paymaster relies on Sanders v. Monsanto Co., 574 F.2d 198, 199-200 (5th Cir.1978), a Fifth Circuit case which held that a civil contempt action should fall within 43(a) because it was "more in the nature of a trial on the merits of a breach of the consent 'contract.' "
 
 
 19
 Sanders relied on the "highly factual" nature of the motion before it, finding oral testimony necessary because the proceedings depended "so heavily on complex facts not readily perceivable from the record." Id. at 199, 200. By contrast, in Miles the Ninth Circuit rejected a claim that oral testimony was required because "Miles' declaration provided the district court with adequate information" to decide the issue. 881 F.2d at 784.
 
 
 20
 We do not believe these cases are inconsistent. Where factual questions not readily ascertainable from the declarations of witnesses or questions of credibility predominate, the district court should hear oral testimony. In this case, however, Paymaster has conceded that the testimony it would present was contained in the declarations submitted to the district court. Further, as Paymaster itself concedes, "the Order granting [American]'s Rule 60(b)(5) Motion is based on the district court's interpretation of settlement documents and undisputed extrinsic evidence." Where, as here, the primary issue before the court is a legal question, and what factual issues do exist are undisputed, we think little purpose would be served by a blanket rule requiring oral testimony.
 
 CONCLUSION
 
 21
 For the foregoing reasons, the judgment of the district court is AFFIRMED.
 
 FLETCHER, Circuit Judge, dissenting:
 
 22
 I dissent. A careful assessment of the relevant documents and the facts belies the majority's position.
 
 
 23
 The majority fails to examine the negotiating positions of Paymaster and American Bankers as a backdrop to the settlement they reached. Paymaster had a judgment against American Bankers, UCIS and the Raydens. Paymaster was awarded $5.5 million in compensatory damages from UCIS, American Bankers and the Raydens, $3.0 million in punitive damages from UCIS and $2.36 million in punitive damages from American Bankers.
 
 
 24
 Paymaster agreed to accept a payment of $1.7 million from UCIS and its insurers as full settlement of its judgment against UCIS and the Raydens. This made sense to Paymaster for two reasons: it removed any uncertainty as to the soundness of its judgment to the extent of $1.7 million and it secured such payment from credit risk. To obtain this settlement, Paymaster had to persuade American Bankers to waive its claims against UCIS. American Bankers, for its part, was faced with a potential $2.36 million liability for punitive damages, which its insurance would not cover. Because it did have coverage for its compensatory damage liability, any reduction in such a sum was not of nearly as great significance to American Bankers. However, the reduction in punitive damages liability was very important to it and thus American Bankers entered into a settlement with Paymaster whereby the $1.7 million UCIS had agreed to pay would be credited towards punitive damages.
 
 
 25
 In light of these facts, the majority's scenario does not have the ring of truth. It would have Paymaster agree to forego the possibility of recovering $3.4 million from American Bankers, a solvent, well-insured defendant, simply to obtain $1.7 million from UCIS, without any concession from American Bankers that it would forego its appeal of Paymaster's judgment against it.
 
 
 26
 Nothing in the various settlement agreements supports the majority's version of the settlement. At the outset, nothing suggests Paymaster would credit American Bankers with a double settlement. Nowhere do the settlement agreements state that the $1.7 million Paymaster credited towards the punitive damages owed it by American Bankers was in addition to a separate $1.7 million setoff against American Bankers' compensatory damages liability. The majority relies on the notion that Paymaster had an affirmative obligation to include in the settlement documents a statement to the effect that the $1.7 million punitive damages reduction obviated the need for the court to apply the general rule of law that a settlement with one defendant reduces the liability of the remaining defendants by an equivalent amount. But there exists no reason, and certainly no support in California law, for placing such a burden on Paymaster here.
 
 
 27
 The purpose of the general rule of law is simply to ensure that a settling plaintiff does not recover twice for her injuries. A party cannot obtain damages from one defendant through a settlement agreement and expect to recoup those same damages again from the remaining defendants. The Paymaster-American Bankers agreement to set off dollar-for-dollar against punitive damages any amounts received from UCIS ensured that this would not happen. Rather than representing a deviation from the normal rule, as the majority contends, it fulfilled the very purpose of that rule. Paymaster stated that it would not attempt to collect from American Bankers the $1.7 million it had already received from UCIS. It did not then have to tell the court not to worry about a double recovery the possibility of which it had already eliminated.
 
 
 28
 The district court and the majority both go outside the settlement agreements and read unwarranted meaning into a passage added by Paymaster's counsel, at American Bankers' insistence, to a letter dated November 11 which accompanied the parties' partial satisfaction of judgment. The passage states as follows:
 
 
 29
 In consideration of ABIC entering into its contingent settlement agreement and mutual release with UCIS, Burt, Eileen, Jeff and Joel Rayden and contingent releases with their insurers, Paymaster yesterday delivered to you a partial satisfaction of judgment against ABIC signed by me.
 
 
 30
 It is difficult to see how this passage supports American Bankers' position that it had negotiated an agreement to receive $3.4 million from Paymaster in return for waiving its cross-claims against UCIS. The passage has nothing to do with the nature of the consideration American Bankers was to receive from Paymaster, but instead concerns the nature of the consideration it had provided to obtain a credit against its punitive damages liability. American Bankers was understandably worried that its insurance companies would question an agreement that was to reduce its punitive rather than its compensatory damages exposure, and it apparently sought to bolster the validity of this agreement by receiving an express declaration of the consideration it had given in order to secure it.
 
 
 31
 Indeed, the November 11 letter contains strong support for Paymaster's position. The letter provides that if Paymaster does not receive its expected payment of $1.7 million from UCIS and the other settling parties, "Paymaster will execute and ABIC [American Bankers] may file a satisfaction of judgment identical in form to that of the $1.7 million satisfaction referred to above providing for satisfaction in such amount as is actually retained by Paymaster from the insurance carriers or settling parties." The actual size of the credit against punitive damages American Bankers was to receive from Paymaster was thus entirely dependent upon the amount of money Paymaster ultimately recovered from UCIS. Far from constituting an independent credit of an additional $1.7 million to American Bankers, then, the punitive damages credit was viewed by the parties as embodying the normal rule of law and operating pursuant to it. By no means did the parties see their agreement as an entirely separate promise by Paymaster to credit American Bankers with an additional and absolute sum of $1.7 million no matter how much UCIS actually paid.
 
 
 32
 I note three other points. First, it is too much of a "coincidence" that the amount of the additional compensation Paymaster and American Bankers supposedly negotiated was identical in amount to that provided by operation of law. It seems far more reasonable to conclude that the parties saw their agreement as embodying the normal rule but crediting the payment against punitive damages instead of compensatory damages.
 
 
 33
 Second, the scenario the majority presents would make sense only if American Bankers had agreed not to appeal the judgment against it. Paymaster would then have been giving up $1.7 million of a judgment that was still subject to appeal, in exchange for a certain, sure, payment. This was not the case, however. The Paymaster-American Bankers settlement did not restrict American Bankers' right to appeal; indeed, American Bankers pursued an appeal to this court and petitioned for certiorari, albeit unsuccessfully.
 
 
 34
 Finally, had American Bankers really sought and received a $3.4 million credit for facilitating Paymaster's receipt of $1.7 million from UCIS, it presumably would have insisted that $2.36 million worth of this credit be allocated towards eliminating the punitive damages award for which it, rather than its insurance companies, was solely responsible. American Bankers has evidenced no intent in the actions leading up to these proceedings to make money for its insurance companies. To the contrary, it has sought all along to protect its own pocketbook at their expense. That is why it requested and received a punitive, rather than a compensatory, damages credit from Paymaster. To hold that it should receive an additional $1.7 million setoff that redounds only to the benefit of its insurers would be to ignore the intent of the parties and to render senseless, from Paymaster's standpoint, the settlement agreement entered into between Paymaster and UCIS.
 
 
 35
 Thus, I dissent.
 
 
 
 [1]
 The other defendants, principally United Commercial Insurance Service (United), had refused to settle with Paymaster unless American dropped its indemnification claim against them. Thus, Paymaster needed American's agreement in order to finalize the original settlement
 
 
 [2]
 The Sixth Circuit has chosen to resolve a similar problem--where the contract is unclear and the court must choose one party's interpretation--by simply ruling against whatever party has the burden of proof. United Steelworkers v. North Bend Terminal Co., 752 F.2d 256, 261 (6th Cir.1984). We reject this approach. In this case, it would result in a ruling for Paymaster, since American chose to file this motion to determine its rights. Had American waited until Paymaster tried to collect on the judgment, on the other hand, such an approach would lead the Court to rule for American. The meaning of a contract should not depend on who instituted the litigation
 
 
 [3]
 Paymaster also argues that it provided a benefit to American by listing the entire settlement with United and the Raydens as compensatory damages (since if United had paid its punitive damages, that amount would not have gone to reduce American's liability). This argument is disingenuous. Paymaster collected $500,000 from the Raydens, and $1.2 million from United's insurers. The Raydens owed no punitive damages, and California law prohibits insurers from paying a punitive damage award. Thus, Paymaster could not have collected the $1.7 million without attributing it all to compensatory damages
 
 
 [4]
 For this reason, the dissent's argument that "[n]othing in the various settlement agreements supports the majority's version of the settlement," post at 859, simply misses the point. Nothing in the agreements supports the dissent's view, either. The dissent is reduced to relying on its common sense beliefs about what the parties ought to have done in order to support its interpretation of the contract. We do not believe this is an appropriate method of contract interpretation
 
 
 [5]
 Under California law, extrinsic evidence is always relevant to help explain what a contract means, but not to vary the written terms. Trident Center v. Connecticut Gen. Life Ins. Co., 847 F.2d 564, 568-70 (9th Cir.1988); Pacific Gas & Elec. Co. v. G.W. Thomas Drayage Co., 69 Cal.2d 33, 69 Cal.Rptr. 561, 565-66, 442 P.2d 641, 645-46 (1968)
 
 
 [6]
 We are not persuaded that the fact that the two amounts are the same compels a different result. Deciding how much a claim is "worth" is necessarily an arbitrary process. It seems perfectly reasonable to us that the parties could have concluded that the amount Paymaster was able to recover from United was a good estimate of the value of American's claim against United
 
 
 [7]
 Because we read the contracts in this way, we have no occasion to consider whether a contrary reading would violate California public policy